UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

NUWAY Alliance, NUWAY House, Inc.,
3 Rs NUWAY Counseling Center,
NUWAY Saint Cloud Counseling Center,          Civil Action No. 25-cv-492 (JRT-ECW)
NUWAY University Counseling Center,
NUWAY Rochester Counseling Center,            **DECLARATION OF DAVID M.**
2118 NUWAY Counseling Center,                 **GLASER**
NUWAY Mankato Counseling Center,
NUWAY Duluth Counseling Center,

       Plaintiffs,

   v.

Minnesota Department of Human Services
Temporary Commissioner Shireen Gandhi,
*in her official capacity*,

       Defendant.

---

    I, David M. Glaser, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

    1.    I am a health care lawyer who has been practicing at Fredrikson & Byron, P.A. for over thirty-two years.

**The Payment Withhold Notices and Communications with DHS**

    2.    On or about April 1, 2022, I learned of a False Claims Act investigation into NUWAY when NUWAY received a Civil Investigative Demand from the U.S. Department of Justice – U.S. Attorney's Office for the District of Minnesota. The main subject of the CID was NUWAY's practice of subsidizing the cost of housing for intensive outpatient

treatment clients who lacked stable housing via NUWAY's Recovery in Supportive Environments (RISE) program.

3. During the first twenty-three months of the DOJ investigation, while my colleagues and I had regular interactions with the U.S. Attorney's Office, we had no contact with the Minnesota Department of Human Services (DHS) about the case. On February 29, 2024, DHS sent Notices of Payment Withhold to a variety of NUWAY intensive outpatient treatment clinics. A true and correct copy of one such payment withhold letter, directed to Provider 577162000, is attached hereto as **<u>Exhibit A</u>**. The letters indicated that an "MHCP payment withhold will start April 1, 2024 and continue until DHS or a prosecuting authority determines there is insufficient evidence of fraud, or until legal proceedings related to the alleged fraud are completed."

4. The letters contained very vague descriptions of the basis for the suspension. Each letter stated that there is "a credible allegation of fraud for which an investigation is pending." The letter continued that DHS had information that NUWAY House, Inc.:

- Billed for services not provided as billed;

- Improperly induced services through the use of illegal kickbacks;

- Failed to return overpayments;

- Submitted claims for which it was not entitled to reimbursement; and

- Failed to document services in compliance with the legal requirements.

The letter indicated that NUWAY "has the right to submit written evidence to DHS explaining why payments should not be withheld."

5.      Upon receipt of the Notices of Payment Withhold, I called a contact at DHS, Carrie Oberg, then-Legal Manager for the DHS Office of Inspector General, to ask whether she could offer any information about the basis for the payment suspension.  Ms. Oberg stated that she was unable to provide any information.  I followed up with Ms. Oberg via email, and on March 8, 2024, NUWAY received a letter from Amanda Novak, Manager for Medicaid Provider Audits and Investigations.  A true and correct copy of the March 8, 2024 letter is attached hereto as **Exhibit B**. The letter stated that DHS was not required to provide specific information regarding an ongoing investigation and that DHS could not disclose any further information.  The letter also noted that "DHS has considered whether good cause exists under state and federal law not to withhold payments to NUWAY and does not find good cause for the affected program at this time."

6.      On March 11, 2024, I submitted written evidence to DHS outlining why DHS should conclude that there was no credible allegation of fraud and why good cause existed to refrain from suspending payments.  A true and correct copy of the March 11, 2024 letter is attached hereto as **Exhibit C**.  Because DHS refused to provide us with any specifics of their concerns, I was forced to speculate about the allegations, assuming that DHS's concerns mirrored those raised in DOJ's False Claims Act investigation.  While the inquiry from the DOJ had at various times considered several questions, over two years the focus had narrowed to two topics:  First, whether NUWAY's RISE program constituted an impermissible kickback to patients, and second, whether NUWAY was billing for the proper number of units when submitting claims.

7.     On March 15, 2024, Thomas Johnson, Deputy Inspector General from the Program Integrity and Oversight Division of DHS, sent me an email indicating that the effective date for the payment suspension would be delayed until May 15, 2025, "giving DHS time to complete its review of NUWAY's March 11 submission and, if DHS determines that the payment withholds must remain in place, additional time for NUWAY to provide notice to clients and facilitate their transition to new providers." A true and correct copy of the March 15, 2024 email is attached hereto as **Exhibit D**. Following receipt of this email, I offered to meet with Mr. Johnson and DHS to discuss the Notices of Payment Withhold, but never received an opportunity to meet with anyone at DHS to discuss the allegations of the Notices of Payment Withhold.

8.     Between April 2024 and November 2025, NUWAY sought additional extensions to the payment withhold deadline with DHS. DHS made clear to me that extensions had been and would be granted while NUWAY communicated with and attempted to resolve the case with DOJ. The most recent extension of the payment withhold deadline expires on February 21, 2025. During the week of January 26, 2025, it became clear that NUWAY would not be able to resolve the case with DOJ.

9.     During the first week of February 2025, I exchanged emails with Betsy Schollmeier, Chief Legal Counsel, OIG Legal Counsel's Office, DHS Officer of Inspector General. A true and correct copy of those emails is attached hereto as **Exhibit E**. Ms. Schollmeier communicated to me that the previous extensions of payment withholds were "with the hopes that NUWAY would resolve its potential litigation with the USAO" and that she had communicated with the U.S. Attorney's Office and Medicaid Fraud Control

Unit (MFCU) partners, who shared with her that no resolution had been reached. Ms. Schollmeier stated that because a resolution between NUWAY and the U.S. Attorney's Office had not been reached, DHS would not entertain another extension of the payment withhold.

**DHS's Payment Withhold Practice**

10.     In my experience as a healthcare attorney, I have handled, or discussed with colleagues at Fredrikson who are handling, at least six payment withhold matters where DHS has refused to explain the basis for a payment suspension beyond the type of surface-level explanations provided to NUWAY and indicated that the decision was not appealable. The withholds routinely last for years, including withholds lasting longer than five years.

11.     I have communicated with many other healthcare attorneys in Minnesota who have had the same experience when representing clients subject to payment withholds.

**DHS's Knowledge of the RISE Program**

12.     Throughout the course of the DOJ investigation, I learned of unequivocal evidence that DHS had been aware of the RISE program for years. For example, in 2019, records demonstrate that NUWAY nominated the RISE program for the DHS Commissioner's Circle of Excellence Awards. As a part of the application for the award, NUWAY submitted a brochure on the RISE program and materials explaining that "all NUWAY clients are eligible to receive recovery residence subsidization contingent upon weekly treatment compliance reflecting outcome-based goals (sobriety, attendance, behavior, etc.)." The information submitted to the DHS Commissioner also noted that

"NUWAY offers this subsidization from their own resources and there is no additional cost to the client or third-party payor."

13.     Records also indicate that on April 5, 2019, four DHS professionals visited and met with four NUWAY employees to learn about the RISE program.  The objectives of the meeting were to "acquaint DHS Staff with RISE Model."  It appears DHS officials toured two recovery residence partner homes, which were listed on the agenda with the monthly fee and NUWAY's coverage for the fee.

14.     Additionally, in April 2019, NUWAY's Public Policy Director emailed a DHS Legislative and Policy Liaison to inquire about who she should talk with to determine whether proposed state legislation would render RISE illegal.  Following that exchange, NUWAY's Public Policy Director called an official with the state OIG to explore whether the proposal would jeopardize the legality of RISE.

15.     On October 31, 2024, I emailed records evidencing these examples to Mr. Johnson, Ms. Novak, and other DHS personnel.  A true and correct copy of the October 31, 2024 email with the attached records is attached hereto as **Exhibit F**.

16.     In the course of the investigation, I have not discovered any evidence suggesting DHS informed NUWAY that RISE may be illegal or that DHS had any other concerns about the RISE program until the issuance of the February 29, 2024 Notices of Payment Withhold.

17.     Further, in the course of the investigation, I discovered evidence that the managed care organizations coordinating Medicaid services for NUWAY were fully aware of the RISE program.  The details of the RISE program are included in their contracts with

NUWAY. For example, NUWAY's contract with Hennepin Health states: "Provider shall provide monthly recovery residence support of $550 to each Eligible Member for the duration of the Member's receipt of covered outpatient treatment from the services Provider." A true and correct copy of NUWAY's contract with Hennepin Health is attached hereto as **Exhibit I**. NUWAY's agreement with HealthPartners has similar language. A true and correct copy of NUWAY's contract with HealthPartners is attached hereto as **Exhibit J**.

## DHS's "Midpoint" Billing Guidance

18. Over the course of the investigation, I have reviewed guidance from DHS regarding so-called "Midpoint" billing. DHS's records indicate that until September 2024 treatment facilities like NUWAY could bill Medicaid for one "unit" of service any time a treatment session went beyond the "midpoint" of an hour, that is, the session lasted at least 31 minutes.

19. In July 2014, DHS issued a Bulletin explaining how to bill for counseling services covered by code H2035 ("alcohol and/or drug counselling per hour"). A true and correct copy of the DHS Bulletin, attached to an email, is attached hereto as **Exhibit G**. The Bulletin explains "that the unit of time is attained when the mid-point is passed, and that more than half of the time must be spent performing the service in order to report that code, excluding any breaks. Accordingly, treatment services must last 31 continuous minutes to qualify as an hour of service." As demonstrated in Exhibit G, the Bulletin was circulated within NUWAY and relied upon in determining how to bill pursuant to DHS's midpoint guidance.

20.     The Bulletin contains examples of how to bill certain periods, one of which is that "31 Minutes of Treatment Services Provided = 1 Billable Hour."

21.     The Minnesota Health Care Programs Manual (Manual) contains billing instructions for treatment programs.  Until a change issued on September 4, 2024, the Manual language was nearly identical to the instruction found in the July 2014 Bulletin.  The Manual said that a "[u]nit of time is attained when the mid-point is passed, and more than half of the time must be spent performing the service for reporting a specific code, excluding any breaks."  Since counseling codes were reported in one-hour increments, under the instruction, the "midpoint" for a unit was 31 minutes, meaning that 31 minutes of counseling was sufficient to bill one unit of H2035.

22.     NUWAY billing records show that—particularly after the COVID-19 pandemic—NUWAY often scheduled its sessions for periods of less than an hour (such as 35-minute sessions), took short breaks, and then began another session of less than an hour.  Because each individual session passed the midpoint, it constituted a "unit of time" for which NUWAY could receive reimbursement.  Consistent with the Bulletin and Manual, NUWAY billed for one unit for these sessions.

23.     The September 4, 2024 revision to the Manual was quite drastic.  Under the new language, a session must be *scheduled* for a full hour in order to bill a unit of service.  If a full hour is scheduled, but the patient leaves unexpectedly after receiving more than 31 minutes of care, a unit may be billed.  I am not aware of any guidance issued by DHS prior to September 4, 2024 that even implied, let alone overtly stated, that the *schedule* had any impact on billing.   Prior to September 2024, all of DHS's instructions to treatment

professionals indicated that it was proper to bill a unit (sometimes referred to as a "billable hour") if more than 31 minutes of treatment was provided. Following the September 2024 revision to the Manual, NUWAY adapted its group treatment schedule and billing practice to conform with DHS's new position.

24.     Additionally, the Human Services portion of the FY 2026-27 Governor's Budget Recommendations, issued on January 16, 2025, discusses proposed changes to the Midpoint billing policy. A true and correct copy of the pages of the FY 2026-2027 Governor's Budget Recommendations discussing "Substance Use Disorder (SUD) Rates-Midpoint Rule" are attached hereto as **Exhibit H**. The discussion refers to the July 2014 memo and explains that there was a "lack of explicit guidance" provided by DHS. The Budget Proposal calls for new statutory language, indicating that DHS recognizes the existing statutory authority permits the practice we assume that DHS is trying to characterize as fraudulent.

**DHS Rejected NUWAY's Offer to Obtain a Bond**

25.     Recognizing that DHS has an interest in protecting its funds, NUWAY has offered to obtain a bond to limit DHS's exposure. DHS responded that it was "not seeing any legal authority for application of a bond." *See* **Exhibit E.**

February 7, 2025

/s/ David M. Glaser

David M. Glaser