# Exhibit I

**MAY CONTAIN NONPUBLIC DATA**
Pursuant to the Minnesota Government Data Practices Act
Minnesota Statutes Section 13.37 and other applicable law
**DO NOT DUPLICATE OR DISSEMINATE**

## HENNEPIN HEALTH AMENDMENT NO. 1 TO AGREEMENT NO. A199857

This Amendment No. 1 to Agreement No. A199857 is between the COUNTY OF HENNEPIN, STATE OF MINNESOTA, A-2300 Government Center, Minneapolis, Minnesota 55487, on behalf of the Hennepin County Hennepin Health (the "COUNTY" or "HENNEPIN HEALTH"), and **NuWay House, Inc.**, 2217 Nicollet Avenue South, Minneapolis, Minnesota 55404, a non-profit corporation duly organized under the laws of the State of Minnesota ("PROVIDER").

The parties agree that Agreement No. A199857, including any prior amendments, is amended as follows:

1. Exhibit III, Business Associate Agreement, shall be added to the Agreement, as attached.
2. Exhibit IV, shall be added to the Agreement, as attached.

This Amendment shall be effective April 1, 2021.

Except as herein amended, the terms, conditions and provisions of Agreement No. A199857, including any prior amendments, shall remain in full force and effect.

## COUNTY APPROVALS:

**COUNTY OF HENNEPIN
STATE OF MINNESOTA
HENNEPIN HEALTH**

By: *Anne Kanyusik Yoakum*
Chief Executive Officer, Hennepin Health

Anne Kanyusik Yoakum
Print Name

Date: 04/01/2021

Reviewed by the County
Attorneys' Office

_____
Assistant County Attorney

Date: March 30, 2021

## NUWAY HOUSE, INC., APPROVALS:

Provider certifies that the person who executed this Agreement is authorized to do so on behalf of the Provider as required by applicable articles, bylaws, resolutions or ordinances.[1]

**NUWAY HOUSE, INC.**

TIN: ███████

By: *[signature]*

Title: CFO

John Marston
Print Name

Date: 3/19/2021

---

[1] Provider shall submit, upon request, applicable documentation (articles, bylaws, resolutions or ordinances) that confirms the signatory's delegation of authority.

# EXHIBIT III
# BUSINESS ASSOCIATE AGREEMENT

**THIS BUSINESS ASSOCIATE AGREEMENT** ("BAA") is between County of Hennepin, State of Minnesota, through its Hennepin Health ("Covered Entity"), and **NuWay House, Inc.** ("Business Associate").

1. **Applicability; Conflicts.** This BAA applies with respect to all contracts or other arrangements between Covered Entity and Business Associate ("Underlying Agreement") that involve the acquisition, access, use or disclosure of Protected Health Information ("PHI") in connection with the provision of the services described in the Underlying Agreement. This BAA addresses the business associate requirements of the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Economic and Clinical Health Act adopted as part of the American Recovery and Reinvestment Act of 2009 and their implementing regulations, as they may be modified or amended from time to time (collectively, "HIPAA"). Covered Entity and Business Associate intend to protect the privacy and provide for the security of PHI disclosed to Business Associate in compliance with HIPAA, which laws are incorporated herein by reference in their entirety. Any ambiguity in this BAA shall be resolved in favor of a meaning that permits the parties to comply with HIPAA. Capitalized terms used, but not otherwise defined, in this BAA shall have the meaning set forth in the HIPAA Privacy, Security, Breach Notification, and Enforcement Rules at 45 C.F.R. Parts 160 and 164 ("HIPAA Rules").

2. **Obligations and Activities of Business Associate.** Business Associate agrees that it shall comply with all the obligations of a Business Associate as required by HIPAA, which specifically include, without limitation, the following:

    2.1  Business Associate shall not acquire, access, use or disclose PHI other than as permitted or required by the Underlying Agreement or this BAA or as required by law.

    2.2  Business Associate shall use appropriate safeguards, consistent with the HIPAA Rules, to prevent acquisition, access, use or disclosure of PHI other than as provided for by the Underlying Agreement or this BAA or as required by law. Moreover, Business Associate shall implement administrative, physical and technical safeguards, and comply with Subpart C of 45 C.F.R. Part 164 with respect to electronic PHI, to preserve the integrity and confidentiality of electronic PHI that it creates, receives, maintains or transmits on behalf of Covered Entity.

    2.3  Business Associate shall promptly report to Covered Entity's Information Security and Privacy Officer any acquisition, access, use or disclosure of PHI in violation of the HIPAA Rules or not provided for by the Underlying Agreement or this BAA, including any breaches of Unsecured PHI as required by 45 C.F.R. section 164.410, and any security incident of which it becomes aware.

2.4 Business Associate shall provide written notice to Covered Entity of any acquisition, access, use or disclosure of PHI described in Section 2.3 ("Breach") within three (3) business days following discovery of any breach. The written notice shall include the following: (a) the identification of each individual who was or may have been impacted by such breach, (b) a description of the circumstances of the breach, (c) a description of the types of unsecured PHI involved in the breach; and (d) a description of what the Business Associate has done or is doing to investigate the breach, mitigate harm to the individual impacted by the breach, and protect against future breaches. Business Associate shall cooperate in good faith with Covered Entity in the investigation of any Breach. Covered Entity reserves the right to make further inquiries or request further action related to the breach. All decisions regarding notification required by the HIPAA Rules related to the breach shall be made by the Covered Entity. Business Associate agrees to assist the Covered Entity with notification steps as directed by the Covered Entity.

2.5 Business Associate shall promptly mitigate, to the extent practicable, any harmful effect that is known to Business Associate of the acquisition, access, Use or Disclosure of PHI by Business Associate, Subcontractors or third parties in violation of the requirements of the HIPAA Rules or the provisions of the Underlying Agreement or this BAA.

2.6 Business Associate shall ensure that any agent, including a Subcontractor, that creates, receives, maintains, or transmits PHI received from Covered Entity, or created by Business Associate on behalf of Covered Entity, agrees in a written document to the same restrictions, conditions and requirements that apply to Business Associate with respect to such information. Business Associate shall ensure that any agent, including a Subcontractor, to whom it provides PHI agrees to implement reasonable and appropriate safeguards to protect such information which shall be no less than those required of Business Associate in Section 2.2 above. The Business Associate is not in compliance with the HIPAA Rules if it knew of a pattern of activity or practice of a subcontractor that constitutes a material breach or violation of the subcontractor's compliance with the HIPAA Rules, unless the Business Associate took reasonable steps to cure the breach or end the violation, and if such steps were unsuccessful terminated the subcontract or arrangement, if feasible.

2.7 Business Associate shall provide access, at the request of Covered Entity, and in the time and manner designated by Covered Entity, to PHI in a designated record set, to Covered Entity or, as directed by Covered Entity, to an Individual, in order to meet the requirements under 45 C.F.R. § 164.524 (Access of Individuals to PHI).

2.8 Business Associate shall make any amendment(s) to PHI in a designated record set that Covered Entity directs or agrees to pursuant to 45 C.F.R. § 164.526 (Amendment of PHI) at the request of Covered Entity, and in a reasonable time and manner designated by Covered Entity. In the event that Business Associate receives a request directly from an Individual for a copy of his/her PHI or to amend his/her PHI, Business Associate shall forward such request to Covered Entity within five (5) business days

after receipt of such request and shall coordinate any disclosure or amendments with Covered Entity.

2.9 Business Associate shall make its internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Business Associate on behalf of, Covered Entity available to the Secretary, and at the request of Covered Entity, to Covered Entity, in a time and manner designated by the Secretary or Covered Entity, for purposes of the Secretary determining Covered Entity's compliance with the HIPAA Rules. Additionally, Business Associate shall immediately advise Covered Entity of any inspection request made by regulators of the Business Associate concerning any PHI obtained from or generated on behalf of Covered Entity.

2.10 Business Associate shall document all disclosures of PHI and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 C.F.R. § 164.528 (Accounting of Disclosures of PHI). Business Associate shall provide to Covered Entity, in a reasonable time and manner designated by Covered Entity, information collected in accordance with the Underlying Agreement or this BAA to permit Covered Entity to respond to such a request by an individual.

2.11 Business Associate shall implement reasonable and appropriate policies and procedures to comply with the standards, implementation specifications, or other conditions, restrictions, and requirements of the HIPAA Rules, including the requirements of 45 C.F.R. § 164.316 and shall make such policies and procedures available to the Secretary and Covered Entity upon request.

### 3. Permitted Uses and Disclosures by Business Associate.

3.1 Except as otherwise limited in the Underlying Agreement or this BAA, Business Associate may acquire, access, use or disclose PHI to perform services for, or on behalf of Covered Entity, as specified in the Underlying Agreement, provided that such acquisition, access, use or disclosure would not violate the HIPAA Rules if done by Covered Entity.

3.2 Business Associate shall request, use and disclose the minimum amount of PHI necessary to perform the services under the Underlying Agreement.

3.3 Except as otherwise limited in this BAA or the Underlying Agreement between Business Associate or Covered Entity, Business Associate may:

   (a) Use PHI, if necessary, for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate; and

   (b) Disclose PHI for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate, provided that such

disclosures are required by law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that such information will remain confidential and will be used or further disclosed only as required by law or for the purpose for which it was Disclosed to the person, and the person is required by the Business Associate to notify the Business Associate of any instances of which the person is aware in which the confidentiality or security of the information has been breached.

    3.4    Business Associate shall not create de-identified PHI from the PHI of Covered Entity unless expressly authorized in the Underlying Agreement or separately in writing by Covered Entity. If Business Associate is authorized to create de-identified PHI, Business Associate shall do so in accordance with the HIPAA Rules and relevant Secretary guidance.

## 4. Obligations of Covered Entity.

    4.1    Covered Entity shall notify Business Associate of any changes in, or revocation of, permission by an individual to use or disclose PHI, if such changes affect Business Associate's permitted or required uses and disclosures.

    4.2    Covered Entity shall notify Business Associate of any restriction to the use or disclosure of PHI that Covered Entity has agreed to in accordance with 45 C.F.R. § 164.522, if such restriction affects Business Associate's permitted or required uses or disclosures.

    4.3    Covered Entity shall not request Business Associate to use or disclose PHI in any manner that would not be permissible under the HIPAA Rules if done by Covered Entity.

## 5. Term and Termination.

    5.1    This BAA shall be effective as of the effective date of the Underlying Agreement and shall terminate when all of the PHI provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy PHI, protections are extended to such information, in accordance with the termination provisions in this Section 5.

    5.2    Upon Covered Entity's knowledge of a material breach of this BAA by Business Associate, Covered Entity shall provide an opportunity for Business Associate to cure the breach or end the violation. Covered Entity may terminate the Underlying Agreement and this BAA if Business Associate does not cure the breach or end the violation within the time specified by Covered Entity. If Business Associate has breached a material term of this BAA and cure is not possible, Covered Entity may immediately terminate the Underlying Agreement and this BAA. This provision shall

be in addition to and shall not limit any rights of termination set forth in the Underlying Agreement.

5.3 (a) Except as provided in 5.3(b), upon termination of this BAA or the Underlying Agreement, for any reason, Business Associate shall return or destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to PHI that is in the possession of subcontractors or agents of Business Associate. Business Associate, its subcontractors or other third parties, shall retain no copies of the PHI in any form. Business Associate shall certify in writing that it has complied with the requirements of this Section 5.

(b) In the event that Business Associate determines that returning or destroying the PHI is infeasible, Business Associate shall notify Covered Entity of the conditions that make return or destruction unfeasible. Upon mutual agreement of the Parties that return or destruction of PHI is unfeasible, Business Associate shall extend the protections of this BAA to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

## 6. Miscellaneous.

6.1 The respective rights and obligations of Business Associate under this BAA shall survive the termination, expiration, or other conclusion of the Underlying Agreement or this BAA.

6.2 This BAA shall inure to the benefit of the parties hereto and each Covered Entity affiliate to or on behalf of which Business Associate provides services, but not to the benefit of any other third party.

6.3 This BAA shall be deemed automatically amended to the extent necessary to comply with changes in law.

6.4 A waiver of any term or provision shall not be construed as a waiver of any other term or provision. Nothing in this BAA shall be deemed a waiver of any legally-recognized claim of privilege available to either party.

6.5 Business Associate will defend, indemnify, and hold harmless Covered Entity and its present and former officials, officers, agents, volunteers, and employees from any liability, claims, causes of action, penalties, judgments, damages, losses, settlement costs, or expenses (including reasonable attorneys' fees) resulting directly or indirectly from any act or omission of the Business Associate or its employees or Subcontractors in the performance of this BAA or from Business Associate's failure to perform its obligations under this BAA.

6.6 Business Associate understands that it is directly subject to all regulatory rules and related penalties set forth in the HIPAA Rules.

6.7 Business Associate is an independent contractor of Covered Entity and is not an agent of Covered Entity. Covered Entity shall not provide Business Associate with interim instruction regarding the Business Associate's compliance with the terms of this BAA.

6.8 To the extent the terms of this BAA conflict with the terms of the Underlying Agreement, the terms of this BAA control regarding Business Associate obligations, HIPAA and PHI.

THIS PORTION OF PAGE INTENTIONALLY LEFT BLANK

# EXHIBIT IV

R.I.S.E. Program and Outcome Measurement

NUWAY House, Inc. ("Provider") and Hennepin Health ("Plan") are parties to the Agreement No. A199857 ("Agreement"), the terms of which govern Provider's participation in Plan's provider network(s) for substance use disorder treatment and co-occurring disorders.

Provider is a non-profit, evidence-based addiction and co-occurring mental health treatment provider specializing in extended care and accredited by The Joint Commission. In 2013, Provider launched its Recovery In Supportive Environments (R.I.S.E.) model of care which is designed to help clients access a full continuum of care, including evidence-based addiction and mental health treatment, high-quality recovery housing, peer support services, and easier access to other community recovery resources. R.I.S.E. aims to improve client outcomes by bridging traditional treatment gaps that can lead to relapse. Provider has developed strong relationships with well-run recovery housing providers to make it easier for its clients to find housing options that best meet their needs. Research indicates that appropriate recovery housing gives clients with substance use disorders a better chance of achieving long-term recovery than those who do not live in recovery-oriented environments.

Plan and Provider seek to assess the value of substance use disorder spending by understanding its effect on quality of life and total cost of care. To evaluate and optimize Provider's implementation of the R.I.S.E. model, Plan and Provider hereby agree to the following terms and conditions, to be incorporated into the Agreement as of April 1, 2021 ("Amendment Effective Date").

The terms of this Agreement are intended to modify or supplement the terms of the Agreement only to the extent expressly stated below. In all other respects, the terms of the Agreement shall be unaffected by Exhibit IV.

1. RECOVERY RESIDENCE SUPPORT

    Plan and Provider acknowledge and agree that Provider will implement R.I.S.E. with all Enrollees who receive covered outpatient treatment services from Provider under the Agreement and will offer recovery residence support to members who are determined to be in need of a recovery safe environment ("Eligible Members"). Provider will assess each Member's recovery or living environment in accordance with dimension six of the American Society of Addiction Medicine criteria (ASAM Criteria). Provider shall provide monthly recovery residence support of $550 to each Eligible Member for the duration of the Member's receipt of covered outpatient treatment services from Provider. Subject to bed availability, the Eligible Member may direct support to any recovery residence that has met Provider's prerequisites and been designated as a preferred provider residence. The recovery residence support shall have no cash value, cannot be sold or transferred to anyone else, and the recovery residence support will be paid by Provider to the selected recovery residence upon confirmation that the Eligible Member has requested monthly housing. The amount paid by Provider will not exceed the actual amount charged by the recovery residence. Acceptance and use of the recovery residence support is voluntary for Eligible Enrollees.

2. PAYMENT FOR COVERED SERVICES

Payment for outpatient treatment services that are Covered Services will be made to Provider in accordance with the terms of the Agreement and applicable payment attachments or exhibits. The contract rate payable under the Agreement is a bundled payment rate that is payment for the treatment services billed and all appropriate R.I.S.E. supports provided to the Enrollee, including recovery residence support.

3. COORDINATED COMMUNICATION

    Hennepin Health will identify NuWay clients engaged in Hennepin Health's Social Service Navigation program. The Social Service Navigation team will be invited to participate in post admission and pre-discharge meetings at NuWay, with Member permission. The post admission coordinated communication team meeting will occur within the first 14 days of admission to the treatment program to discuss Member goals and service needs post-discharge. Approximately 10 days prior to discharge, a Hennepin Health Social Service team Member will attend a discharge review meeting at NuWay along with the Member, to assist with coordination of medical, behavioral health, and community service needs.

4. DATA AND INFORMATION

    A. Plan agrees to provide data reports to Provider in accordance with this paragraph to assist Provider in better identifying, coordinating and addressing the needs of the population served in an effort to improve outcomes for Enrollees and to determine performance relative to other providers and performance changes over time. Data will be provided in a format mutually agreed by the parties. Initially data will be provided in an aggregate format and once all Member release of information/consent has been secured Plan may provide the following data:

        (1) All fields from Member medical, pharmacy, transportation, and dental claim data.

        (2) All fields from Member mental health claim data.

        (3) Details on substance use disorder treatment progression.

        (4) Risk scores and risk score components.

        (5) Eligibility and renewal details.

        (6) Social services utilization.

        (7) Social needs or predicted social needs.

        (8) Medication compliance.

        Including similar types of information deemed applicable by the Plan and Provider.

5. BASELINE MEASUREMENTS AND VALUE-BASED PROGRAM

    A. Plan will work with Provider to evaluate and monitor the effectiveness of the R.I.S.E.

model of care, with the goal of comparing outcomes and overall utilization to standard treatment models. The parties agree to discuss appropriate quality measures and, if mutually agreed, to implement the evaluation of quality metrics. The parties also agree to meet periodically to discuss in good faith potential opportunities to incorporate a value-based arrangement into this Agreement that would provide financial incentives for Provider's successful implementation of a broader population management strategy and reductions in overall cost of care, and the necessary steps to lay the groundwork for such an arrangement.

B. Measures to be considered by the parties could include (but are not limited to) the following:

(1) Risk Scores (including clinical components).

(2) Total Cost of Care.

(3) Utilization:
    a) Emergency Department.
    b) Inpatient stays.
    c) Readmissions.

(4) Treatment Progress:
    a) Progress from high to low levels of care.
    b) Immediate access.
    c) Completion rates.
    d) Return to treatment speed on recurrence.

(5) SURE Patient Reported Outcome Measure for Recovery from Drug and Alcohol Dependence.

THIS PORTION OF PAGE INTENTIONALLY LEFT BLANK