| | |
|---|---|
| NUWAY Alliance, NUWAY House, Inc., 3 Rs NUWAY Counseling Center, NUWAY Saint Cloud Counseling Center, NUWAY University Counseling Center, NUWAY Rochester Counseling Center, 2118 NUWAY Counseling Center, NUWAY Mankato Counseling Center, NUWAY Duluth Counseling Center | Case No. 25-cv-492 (JRT/ECW) |
| Plaintiff, | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| v. | |
| Minnesota Department of Human Services Temporary Commissioner Shireen Gandhi, *in her official capacity*, | |
| Defendant. | |

Plaintiffs NUWAY House, Inc., 3 Rs NUWAY Counseling Center, NUWAY Saint Cloud Counseling Center, NUWAY University Counseling Center, NUWAY Rochester Counseling Center, 2118 NUWAY Counseling Center, NUWAY Mankato Counseling Center, NUWAY Duluth Counseling Center (collectively, "NUWAY") submit the following memorandum in support of their motion for a temporary restraining order and preliminary injunction enjoining Minnesota Department of Human Services Temporary Commissioner Shireen Gandhi ("DHS") from withholding Minnesota Health Care Programs payments ("Medicaid payments") for substance use disorder treatment services to NUWAY.

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................ 1

BACKGROUND ........................................................................................ 2

I.    MEDICAID COVERS SUBSTANCE USE DISORDER SERVICES. .................. 2

II.   NUWAY PROVIDES AWARD-WINNING TREATMENT AND
RECOVERY RESIDENCES TO CLIENTS WITH SUBSTANCE USE
DISORDERS. ....................................................................................... 2

III.  A DOJ INVESTIGATION PROMPTED THE ISSUANCE OF NOTICES
OF PAYMENT WITHHOLDS. .............................................................. 5

ARGUMENT ............................................................................................. 7

I.    DHS'S PAYMENT SUSPENSION WILL CAUSE IMMINENT,
IRREPARABLE HARM TO NUWAY AND ITS PATIENTS. ............................. 8

    A.    NUWAY Will Suffer Imminent, Irreparable Harm If DHS's
Payment Withholding Is Not Enjoined. ........................................ 8

        1.    Absent an injunction, NUWAY will suffer severe economic
hardship and, likely, cessation of its operations................................. 9

        2.    Absent an injunction, NUWAY will suffer severe
professional and reputational harm. ................................................ 10

    B.    NUWAY's Patients Will Suffer Imminent, Irreparable Harm If
DHS's Payment Withhold Is Not Enjoined................................. 12

II.   NUWAY IS LIKELY TO SUCCEED ON THE MERITS OF ITS
CLAIMS. ........................................................................................... 13

    A.    NUWAY Has a Protected Interest. ........................................... 14

    B.    DHS Failed to Provide Constitutionally Sufficient Procedures. ................. 17

        1.    DHS failed to adhere to the statutory procedures for
suspending NUWAY's payments. ................................................ 17

            a.    DHS failed to provide NUWAY a hearing. .......................... 18

b.    DHS failed to consider whether good cause existed not to suspend payments. ..............................................................19

c.    DHS failed to consider the required factors for sanctions. ...............................................................................24

d.    DHS failed to impose a "temporary" suspension..................25

e.    The (suspected) allegations against NUWAY are not credible allegations of fraud. ...................................................27

     (i)    NUWAY's RISE program is not fraudulent. .............28

     (ii)    NUWAY's prior "midpoint" billing practice is not fraudulent. ............................................................36

2.    Alternatively, Minnesota's Statute Regarding the Suspension of Medicaid Payments Is Unconstitutional. ......................................39

III.    THE BALANCE OF HARMS AND THE PUBLIC'S INTEREST FAVOR INJUNCTIVE RELIEF. ..........................................................................39

CONCLUSION ..............................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abba Pharmacy Inc. v. Perales*,
No. 87-CV-266 (MGC), 1987 WL 13277 (S.D.N.Y. June 29, 1987) ................... 16, 39

*Alexandre v. Ill. Dep't of Healthcare & Fam. Servs.*,
No. 20-CV-6745, 2021 WL 4206792 (N.D. Ill. Sept. 15, 2021) ..................... 17, 27, 39

*Baker Elec. Co-op., Inc. v. Chaske*,
28 F.3d 1466 (8th Cir. 1994) ................................................................ 8

*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972) .......................................................................... 14

*Burgess v. W. Va. Dep't of Hum. Servs.*,
903 S.E.2d 609 (W. Va. Ct. App. 2024) .......................................... 14, 19

*U.S. ex rel. Burlbaw v. Orenduff*,
548 F.3d 931 (10th Cir. 2008) ............................................................ 33

*United States ex rel. Cairns v. D.S. Med. LLC*,
42 F.4th 828 (8th Cir. 2022) .............................................................. 29

*Carlson v. City of Duluth*,
958 F. Supp. 2d 1040 (D. Minn. 2013) .................................................. 8

*Cleveland Bd. Of Educ. v. Loudermill*,
470 U.S. 532 (1985) .......................................................................... 13

*Clinton v. City of New York*,
524 U.S. 417 (1998) .......................................................................... 35

*Compassion in Dying v. Washington*,
79 F.3d 790 (9th Cir. 1996) ............................................................... 12

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
640 F.2d 109 (8th Cir. 1981) ....................................................... 7, 8, 39

*E. Coast Test Prep LLC v. Allnurses.com, Inc.*,
167 F. Supp. 3d 1018 (D. Minn. 2016) ................................................. 12

# TABLE OF AUTHORITIES

Page

*Gen. Motors Corp. v. Harry Brown's, LLC*,
    563 F.3d 312 (8th Cir. 2009) ........................................................................ 8

*Heartland Acad. Cmty. Church v. Waddle*,
    335 F.3d 684 (8th Cir. 2003) ...................................................................... 13

*Hosp. of Phila. v. Horizon NJ Health*,
    No. 07-CV-5061, 2008 WL 4330311 (E.D. Pa. Sept. 22, 2008) ................. 12

*Maynard v. Bonta*,
    02-CV-6539, 2003 U.S. Dist. LEXIS 16201 (C.D. Cal. Aug. 29, 2003) ............. 16, 39

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*,
    298 F. Supp. 2d 27 (D.D.C. 2002) ............................................................. 11

*Norwest Bank of N.D., N.A. v. Doth*,
    159 F.3d 328 (8th Cir. 1998) ...................................................................... 14

*Novus Franchising, Inc. v. Dawson*,
    725 F.3d 885 (8th Cir. 2013) ........................................................................ 8

*Olson v. Fairview Health Servs. of Minn.*,
    831 F.3d 1063 (8th Cir. 2016) .................................................................... 29

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
    280 F.3d 278 (3d Cir. 2002) ....................................................................... 12

*Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*,
    558 F.2d 861 (8th Cir. 1977) ...................................................................... 10

*Powers v. Ohio*,
    499 U.S. 400 (1991) .................................................................................... 12

*Ram v. Heckler*,
    792 F.2d 444 (4th Cir. 1986) ...................................................................... 14

*Ryko Mfg. Co. v. Eden Servs.*,
    759 F.2d 671 (8th Cir. 1985) ...................................................................... 10

*United States ex rel. Schutte v. SuperValu Inc.*,
    598 U.S. 739 (2023) .................................................................................... 38

# TABLE OF AUTHORITIES

Page

*Semmes Motors, Inc. v. Ford Motor Co.*,
429 F.2d 1197 (2d Cir. 1970) ................................................................. 10

*Singleton v. Wulff*,
428 U.S. 106 (1976) ............................................................................... 12

*Swarthout v. Cooke*,
562 U.S. 216 (2011) ............................................................................... 13

*Wang v. FMC Corp.*,
975 F.2d 1412 (9th Cir. 1992) ............................................................... 33

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
485 F. Supp. 3d 1 (D.D.C. 2020) ........................................................... 12

*Yorktown Med. Lab'y, Inc. v. Perales*,
948 F.2d 84 (2d Cir. 1991) .................................................................... 39

**Statutes**

31 U.S.C. § 3729 ........................................................................................... 29

42 U.S.C. 1320a–7a ...................................................................................... 35

42 U.S.C. § 1320a-7b ............................................................................. 29, 33

42 U.S.C. § 1396 ........................................................................................... 14

Minn. Stat. § 256B.064 ........................................................................ *passim*

Minn. Stat. § 256B.0625 .................................................................................. 2

**Regulations and Rules**

42 CFR § 455.23 .................................................................................... *passim*

42 CFR § 455.2 ........................................................................................ 28, 32

Minn. Rule 9530.6620 ............................................................................ 34, 36

## INTRODUCTION

Through a "temporary payment withhold" of Medicaid reimbursement funds, Defendant DHS seeks to indefinitely—and, in effect, permanently—close the doors of one of Minnesota's largest providers of outpatient substance use disorder treatment. In what appears to be an overreaction to widespread public criticism of DHS for allowing companies to steal hundreds of millions of public dollars without providing any services, DHS seeks punish NUWAY—which provides one thousand Minnesotans with high-quality treatment per day—by summarily shuttering it without any meaningful notice of the allegations against it or an opportunity to be heard. In denying NUWAY these rights, DHS violates NUWAY's constitutional rights, as well as rights clearly set forth under federal and Minnesota law.

Upon information and belief, DHS's actions are premised on unproven allegations of fraud from the Department of Justice, which NUWAY vigorously denies. The combination of a federal government investigation and DHS's "temporary" payment withhold presents NUWAY with two options: settle a case with DOJ on DOJ's terms or stand by idly while DHS's payment withhold goes into effect. The result of both options is the same: the swift demise of NUWAY's award-winning intensive outpatient treatment program. More troubling, DHS's actions will evict hundreds of Minnesotans from the sober housing provided by NUWAY, disrupt the substance abuse disorder treatment for one thousand individuals, and, in summary fashion, shut down NUWAY. For the foregoing reasons, DHS's payment withhold must be enjoined.

## BACKGROUND

### I.   MEDICAID COVERS SUBSTANCE USE DISORDER SERVICES.

Minnesota's Medicaid program, known as Medical Assistance, "covers substance use disorder treatment services."  Minn. Stat. § 256B.0625, subd. 24a; *see also* Substance Use Disorder (SUD) Services, MHCP Provider Manual, Minn. Dep't of Hum. Servs. (rev. Jan. 16, 2015).[1]  NUWAY is an enrolled substance use disorder services provider with Minnesota Health Care Programs (MHCP).  (Roberts Decl. ¶ 4).  As such, NUWAY receives reimbursements from MHCP for services provided to its clients, including nonresidential (outpatient) individual and group treatment services, residential treatment services, treatment coordination, and recovery peer support.  (*Id.*)

### II.   NUWAY PROVIDES AWARD-WINNING TREATMENT AND RECOVERY RESIDENCES TO CLIENTS WITH SUBSTANCE USE DISORDERS.

NUWAY was founded as a nonprofit in 1966, serving as a "halfway house" for individuals engaged in long-term substance use disorder recovery.  (*Id.* ¶ 3.)  NUWAY grew to establish additional halfway houses through the 1990s.  Following the implementation of rate reform in 2011, many providers of halfway houses and extended care addiction treatment services opted to become high-intensity residential treatment centers.  (*Id.* ¶ 6.)  This left a gap in extended care services for individuals immediately following their discharge from high-intensity residential treatment centers; many such

---

[1]    Available     at     https://www.dhs.state.mn.us/main/idcplg?IdcService=GET _DYNAMIC_CONVERSION&RevisionSelectionMethod=LatestReleased&dDocName= id_008949 (last visited Feb. 7, 2025).

clients were discharged to the street, only to return to use and start the cycle of use, admission, and discharge all over again.  (*Id.*)

Recognizing this gap in services following discharge from high-intensity residential treatment, and with the goal of disrupting the relapse cycle of substance use disorder, NUWAY created the "RISE" program—Recovery In Supportive Environments—which pairs intensive outpatient treatment with safe housing.  (*Id.* ¶ 7.)  Historically, intensive outpatient therapy was provided forty hours per week over the course of five weeks.  (*Id.*)  RISE changed the Minnesota treatment paradigm by shortening the therapeutic day while also increasing the potential number of days those clients had access to therapy.  (*Id.*)

RISE was also specifically designed to address the fact that Minnesota's Housing Support program—the State's only available housing program for substance use disorder patients—did not have the capacity or appropriate parameters to serve individuals participating in an intensive outpatient program.  (*Id.* ¶¶ 8, 15–16.)  The RISE program's vetted, independent, and abstinence-based recovery residence operators ensure access to stable, recovery-focused environments for clients engaged in clinical care services.  (*Id.* ¶¶ 9, 10.)

Through RISE, NUWAY subsidizes its clients' housing costs while they participate in intensive outpatient treatment with NUWAY and for a thirty-day period following the successful conclusion of their treatment.  (*Id.* ¶ 10.)  RISE originally provided a stipend in the amount of $550 per month; the current stipend is $700 per month.  (*Id.*)

The RISE program is effective.  A University of Minnesota study showed that NUWAY's intensive outpatient clients were twenty percent more likely to complete

treatment if they participated in RISE and, on average, participants in RISE spent thirty-seven more days in treatment than those not in housing.  (*Id.* ¶ 13.)

The effectiveness of NUWAY's RISE program has been publicly recognized. UCare, a Managed Care Organization that coordinates and manages Medicaid-supported services for NUWAY clients, presented NUWAY with its Innovation Award for the RISE program.  (*Id.*)  UCare specifically recognized RISE for "implementing innovative strategies to improve the mental health and addiction recovery of UCare members" and "addressing housing insecurity as part of addiction care to help individuals who struggle most to gain access to sustainable recovery from addiction."  (*Id.*)

Today, NUWAY is one of Minnesota's largest providers of co-occurring substance use disorder and mental health treatment.  (*Id.* ¶ 12.)  In 2024, NUWAY provided intensive outpatient treatment to over 4,800 clients and outpatient treatment to more than 540 clients.  (*Id.*)  Of those intensive outpatient clients, over 80% consistently participated in the RISE program.  (*Id.*)  Currently, NUWAY serves over 800 clients in intensive outpatient treatment and more than 80 patients in outpatient treatment.  (*Id.*)  Of NUWAY's current intensive outpatient clients, 84% are participating in the RISE program.  (*Id.*)  NUWAY's intensive outpatient program is offered at seven locations across six counties in Minnesota, which includes recovery residences for patients in rural and underserved areas.  (*Id.*)

In addition to its intensive outpatient program, NUWAY also operates a group of smaller residential *inpatient* treatment programs, which currently serve over 200 clients in five locations in Minnesota.  (*Id.* ¶ 13.)

### III. A DOJ INVESTIGATION PROMPTED THE ISSUANCE OF NOTICES OF PAYMENT WITHHOLDS.

On April 1, 2022, NUWAY received a Civil Investigative Demand from the U.S. Department of Justice – U.S. Attorney's Office for the District of Minnesota related to a False Claims Act investigation. (*Id.* ¶ 2.) The main subject of the CID was NUWAY's practice of subsidizing housing for clients via the RISE program. (*Id.*) For nearly two years following the issuance of the CID, NUWAY was in contact with the U.S. Attorney's Office, but not DHS. (*Id.* ¶ 3.)

On February 29, 2024, DHS issued Notices of Payment Withhold to nine NUWAY clinics that provide intensive outpatient treatment (the "Notices"). (*Id.* ¶ 3.) The Notices stated that DHS would withhold all MHCP payments to NUWAY for substance use disorder treatment services effective April 1, 2024, because DHS "determined there is a credible allegation of fraud for which an investigation is pending under the MHCP." (*Id.* ¶ 4 & Ex. A.) The Notices provided no indication of the evidence upon which DHS relied in making its determination and no specific allegations against NUWAY. (*Id.*) Rather, the Notices generically stated DHS has "information" that NUWAY:

- Billed for services not provided as billed;

- Improperly induced services through the use of illegal kickbacks;

- Failed to return overpayments;

- Submitted claims for which it was not entitled to reimbursement; and

- Failed to document services in compliance with legal requirements.

(*Id.*)

NUWAY repeatedly attempted to obtain more information regarding the basis for the Notices, but DHS refused to provide any. (*Id.* ¶ 5.) Indeed, DHS refused to even confirm if the Notices were based on the DOJ investigation. (Glaser Decl., Ex. C at 2.) On March 8, 2024, DHS sent NUWAY a letter which, among other things, stated that DHS had "considered whether good cause exists under state and federal law not to withhold payments to NUWAY and does not find good cause for the affected program at this time." (Roberts Decl. ¶ 5 & Ex. B.) On March 11, 2024, NUWAY submitted written evidence to DHS outlining why DHS should find no credible allegation of fraud existed and why good cause existed to refrain from suspending payments. (*Id.* ¶ 6 & Ex. C.) DHS did not substantively respond.

Over the following months, however, DHS repeatedly extended the effective date of the payment withholds—allowing NUWAY to continue to receive MHCP reimbursement for its services—making clear that extensions would be granted so long as NUWAY communicated with and attempted to resolve the case with DOJ. (*Id.* ¶¶ 7–8.) During the week of January 26, 2025, it became clear that NUWAY would not resolve the case with DOJ. (*Id.* ¶ 8.) During the first week of February 2025, DHS informed NUWAY that, because a resolution between NUWAY and the U.S. Attorney's Office had not been reached, DHS would not entertain another extension of the payment withhold. (*Id.* ¶ 9.) NUWAY's MHCP payments will be indefinitely suspended starting on February 21, 2025.

On February 4, 2025, DHS and NUWAY met to discuss the transition of NUWAY patients to other treatment and housing providers if the payment withholds went into effect.

In a stunning admission regarding the impending peril for NUWAY clients, DHS inquired whether NUWAY had capacity in any of its inpatient treatment programs such that NUWAY'S intensive outpatient clients could be transferred to that higher level of care after payment withholds were in place and NUWAY's intensive outpatient treatment ceased. (*Id.* ¶ 18). In other words, DHS was inquiring whether clients in the NUWAY program allegedly tainted by fraud could be transferred to a higher level of care—in other words, a level of care that is not medically necessary for the clients and more expensive for DHS—with the same entity that DHS believes has committed fraud.

If allowed to go into effect, the impact of the payment withholds on NUWAY and NUWAY's clients will be catastrophic. Justice requires the Court to enjoin DHS's payment withholds while NUWAY avails itself of the due process it is entitled to under the Constitution as well as federal and state law.

## ARGUMENT

Courts weigh four factors in determining whether to grant a temporary restraining order or preliminary injunction: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other parties; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). These factors are not applied rigidly; rather, the ultimate question is "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* at 113. Whether to issue a TRO or a

preliminary injunction is within the broad discretion of the Court. *Carlson v. City of Duluth*, 958 F. Supp. 2d 1040, 1057 (D. Minn. 2013).

Although no single *Dataphase* factor is dispositive, *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994), here, the equities and each of the *Dataphase* factors all favor granting an injunction.

## I.    DHS'S PAYMENT SUSPENSION WILL CAUSE IMMINENT, IRREPARABLE HARM TO NUWAY AND ITS PATIENTS.

An injunction should issue because NUWAY and its patients will be irreparably injured if DHS is allowed to undertake its payment suspension without providing any pre-deprivation opportunity to present its case. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). But "the injury need not have been inflicted when application is made or be certain to occur; a strong threat of irreparable injury before trial is an adequate basis." 11A Wright & Miller, *Fed. Prac. & Proc.* § 2948.1 (3d ed.) (footnote omitted). In order to establish irreparable injury, NUWAY need only show that "harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (cleaned up). NUWAY and its patients easily meet that standard here.

### A.    NUWAY Will Suffer Imminent, Irreparable Harm If DHS's Payment Withholding Is Not Enjoined.

NUWAY faces two categories of imminent, irreparable harm if DHS's payment withholds go into effect. First, NUWAY will have to shutter, at a minimum, its intensive

outpatient treatment program and, likely, all of its treatment offerings.  Second, any closure will have a dramatic negative effect on NUWAY's professional and reputational standing, ultimately impeding its ability to ever successfully provide substance abuse disorder treatment in the future.  These imminent, irreparable harms support an injunction.

> **1.  Absent an injunction, NUWAY will suffer severe economic hardship and, likely, cessation of its operations.**

NUWAY is a mission-driven organization serving the needs of predominantly low-income individuals.  (Roberts Decl. ¶ 5.)  Accordingly, NUWAY is highly dependent on Medicaid-supported payments to fund its treatment operations.  Approximately sixty-six percent of NUWAY's revenue is generated through its outpatient treatment program, and more than ninety percent of those revenues are from Medicaid-supported payors.  (*Id.*)  If NUWAY cannot be paid for the services it provides to Medicaid beneficiaries, it cannot operate.  (*Id.* ¶¶ 25–29.)  If DHS's payment withhold goes into effect, NUWAY will likely be forced to cease intensive outpatient treatment within sixty days.  (*Id.* ¶ 29.)  In addition, the chances that NUWAY's inpatient residential treatment program can survive without being bolstered by the revenue from NUWAY's outpatient treatment program are slim.  (*Id.*)

Even though the payment suspension has not yet gone into effect, NUWAY has already begun to feel its impact in significant ways.  Some of these impacts include:  (1) a decrease in client consistency of treatment engagement, (2) a cessation of external employment applicants to fill critical client-facing service roles, (3) a significant decrease in existing staff morale, (4) notifications from trusted community partners of their intent to

cease referrals to NUWAY's programs;  and (5) preemptive reimbursement stoppages from state contracted payers. (*Id.* ¶ 28.)  Two hundred clinicians and forty practicum students, face the loss of their livelihoods and college credits.  (*See id.* ¶ 27.)

The loss of an entire business or organization is quintessentially irreparable harm for which there is no adequate legal remedy. *Ryko Mfg. Co. v. Eden Servs.*, 759 F.2d 671, 673 (8th Cir. 1985) (irreparable harm exists when a party would be "possibly forced out of business" absent an injunction).  Indeed, "when the potential economic loss is so great as to threaten the existence of the moving party's business, then a preliminary injunction may be granted, even though the amount of direct financial harm is readily ascertainable." Wright & Miller, *supra* § 2948.1; *see also Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (affirming grant of injunction where "the right to continue a business" engaged in "for twenty years" was "not measurable entirely in monetary terms," constituting irreparable harm).  The probable "adverse effect" on a healthcare provider's business, "coupled with the incalculable loss of revenue, provides a basis for finding irreparable injury" from anticipated government action.  *Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 866–67 (8th Cir. 1977) (finding that in such a situation "the equities . . . tip decidedly in [the provider's] favor").

### 2. Absent an injunction, NUWAY will suffer severe professional and reputational harm.

Even if NUWAY could initially survive DHS's payment suspension or DHS later reinstated payments, NUWAY's operations would be irreparably damaged due to the reputational injury DHS's unlawful action will inflict.  "Injury to reputation or goodwill is

not easily measurable in monetary terms, and so often is viewed as irreparable." Wright & Miller, *supra* § 2948.1. The loss of goodwill and the impact that loss will have on future business, specifically, is an irreparable injury for which injunctive relief is appropriate. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27, 34 (D.D.C. 2002) (loss of clients from business disruption would cause irreparable harm through loss of customer goodwill and trust that could not be compensated by money damages).

The dramatic disruption a payment suspension will cause to NUWAY's operations will result in its patients needing to obtain substance abuse disorder treatment services from other providers—to the extent other providers even have capacity to take on NUWAY's one thousand clients (as discussed more below, an unlikely proposition). Patients will likely not return to NUWAY because they will lose trust in NUWAY, an important component in addiction treatment services. (Roberts Decl. ¶ 26.) The same is true of NUWAY's recovery residence partners, who will be faced with an immediate negative impact to their sustainability and the potential prospect of having to close their doors permanently. (*Id.* ¶¶ 25, 26.) Absent immediate injunctive relief, DHS's imminent yet indefinite payment suspension is likely to prevent NUWAY from ever recovering its operations at all, even if NUWAY vindicates its position that it did not commit fraud.

**B.      NUWAY's Patients Will Suffer Imminent, Irreparable Harm If DHS's Payment Withhold Is Not Enjoined.**

In addition, DHS's imminent payment suspension will impose irreparable harm on NUWAY's patients if not immediately enjoined.[2] (Roberts Decl. ¶¶ 21–24; *see generally* N.S. Decl.)  NUWAY's patients are extremely vulnerable individuals who rely on NUWAY not only for substance abuse disorder treatment, but many also rely on NUWAY for their housing.  (Roberts Decl. ¶¶ 21–24; N.S. Decl. ¶¶ 10–13.)  Should NUWAY's operations cease due to DHS's unlawful payment suspension, their patients' lives will be upended.  (N.S. Decl. ¶¶ 13–14.)  A simultaneous interruption of care and their stable recovery environment will have disastrous effects for NUWAY's patients.  (N.S. Decl. ¶¶ 13–14; *see also* Roberts Decl. ¶ 24.)

---

[2]      NUWAY has third-party standing to assert the irreparable harm its patients will suffer.  Third-party standing is appropriate when there is "some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991); *see also Singleton v. Wulff*, 428 U.S. 106, 114–15 (1976) (approving litigation of third party interests where (1) "the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue" and (2) "the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter").  Provider-patient relationships commonly meet this standard. Wright & Miller, *supra* § 3531.9.3; *see, e.g.*, *Singleton*, 428 U.S. at 114–16 (1976); *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 291 (3d Cir. 2002); *Compassion in Dying v. Washington*, 79 F.3d 790, 795 (9th Cir. 1996), *rev'd on other grounds*, 521 U.S. 702 (1997); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 34 (D.D.C. 2020); *Child.'s Hosp. of Phila. v. Horizon NJ Health*, No. 07-CV-5061, 2008 WL 4330311, at *5–6 (E.D. Pa. Sept. 22, 2008).  The stigma surrounding substance abuse disorder treatment—and the socio-economic conditions that accompany it—are a sufficient impediment to the ability of NUWAY's patients to represent themselves.  (N.S. Decl. ¶¶ 14–15.) *See E. Coast Test Prep LLC v. Allnurses.com, Inc.*, 167 F. Supp. 3d 1018, 1022 (D. Minn. 2016) (quoting *Green Spring Health Servs.*, 280 F.3d at 291).

## II. NUWAY IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

At this early stage of the proceedings, the movant "is not required to prove a mathematical (greater than fifty percent) probability of success on the merits." *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003). Rather, the movant need only demonstrate a "fair chance of prevailing." *Id.*

Nuway asserts § 1983 claims alleging that DHS has violated its right to due process under the Fourteenth Amendment.[3] The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property without due process of law." Typically, such protections entail prior notice and a meaningful opportunity to be heard. *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). To prevail on a § 1983 procedural due process claim, NUWAY must show: (1) it was deprived of a protected interest, and (2) the procedures followed by the government were constitutionally insufficient. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). NUWAY is likely to succeed on both elements.

---

[3]    NUWAY asserts two additional causes of action: a § 1983 claim alleging that DHS has violated its federal right under the Medicaid Act and its implementing regulations (specifically 42 CFR § 455.23), and a declaratory judgment cause of action. NUWAY is likely to succeed on the merits of those claims as well. Because all three of NUWAY's causes of action are based on the same core assertion—that DHS has violated NUWAY's right to due process—and because NUWAY need only be likely to succeed on the merits of one claim to obtain a TRO or preliminary injunction, NUWAY focuses on its first cause of action.

## A.     NUWAY Has a Protected Interest.

A person has a property interest in a benefit if he or she has "a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Federal property interests under the Fourteenth Amendment usually arise from rights created by state statutes, state or municipal regulations or ordinances, or contracts with public entities. *See id.* at 576–77. At least one circuit has recognized that a provider's "expectation of continued participation in the Medicare program" is a protected property interest. *Ram v. Heckler*, 792 F.2d 444, 447 (4th Cir. 1986). The Court should adopt that holding here.[4] In addition, the applicable federal and state statutes create a protected interest in the Medicaid-supported claims NUWAY submits to DHS.

Medicaid is a cooperative federal-state program, which states may administer and regulate consistent with federal law. *See, e.g.*, *Norwest Bank of N.D., N.A. v. Doth*, 159 F.3d 328, 331 (8th Cir. 1998). Accordingly, both federal and state law are relevant. Federal statute requires that states "provide for procedures of prepayment and postpayment claims review, including review . . . to ensure the proper and efficient payment of claims and management of the program." 42 U.S.C. § 1396a(a)(37).

---

[4]     To be sure, there is a split of authority regarding whether providers have protected property interests in payments from federal healthcare programs, such as Medicaid. *See, e.g.*, *Burgess v. W. Va. Dep't of Hum. Servs.*, 903 S.E.2d 609, 620 n.19 (W. Va. Ct. App. 2024) (collecting cases). The issue is unsettled in this jurisdiction.

Federal regulations, in turn, provide certain minimum requirements for states' procedures. Relevant here is 42 C.F.R. § 455.23, which addresses "[s]uspension of payments in cases of fraud" in the Medicaid program. The regulation provides:

> The State Medicaid agency must suspend all Medicaid payments to a provider after the agency determines there is a credible allegation of fraud for which an investigation is pending under the Medicaid program against an individual or entity unless the agency has good cause to not suspend payments or to suspend payment only in part.

*Id.* § 455.23(a)(1). Such suspensions must be "temporary." *Id.* § 455.23(c). The regulation sets forth deadlines for state Medicaid agencies to provide notice of the suspension and what information the notice must include. *Id.* § 455.23(a)(2), (b)(1). Crucially, a provider "may request, and *must be granted*, administrative review where State law so requires." *Id.* § 455.23(a)(3) (emphasis added).

In Minnesota, state law so requires. Minnesota law requires that providers be afforded a hearing—in particular, a contested case proceeding under Minnesota's Administrative Procedure Act. *See* Minn. Stat. § 256B.064, subd. 2(a), (f). The timing of that hearing depends on the facts of the case. The "suspension or withholding of payments" is categorized as a "sanction" under Minnesota law. *Id.*, subd. 1b. Generally, DHS may not impose a sanction on a provider "without prior notice and an opportunity for a hearing, according to chapter 14, on the commissioner's proposed action." *Id.*, subd. 2(a). There are two exceptions to those timing requirements, both related to suspending or withholding payments.

First, DHS "may suspend or reduce payment" to certain providers "*after* notice and prior to the hearing" if, in DHS's opinion, it "is necessary to protect the public welfare and the interests of the program." *Id.* (emphasis added). Second, DHS can "withhold or reduce payments" to a provider "without providing advance notice" if it "determines there is a credible allegation of fraud for which an investigation is pending under the program" and a lack of "good cause not to suspend payments under Code of Federal Regulations, title 42, section 455.23(e) or (f)." *Id.* subd. 2(a)-(b). In sum, the first exception allows DHS to withhold payments before providing a hearing but only after providing notice. *Id.*, subd. 2(a). The second exception allows DHS to withhold payments before *both* the hearing and notice. *See id.*, subd. 2(a) (providing that "prior notice and an opportunity for a hearing" is required except as provided otherwise in paragraph (b)); *id.*, subd. 2(b) (modifying only "advance notice"). Regardless of the timing of the notice and hearing vis-a-vis the payment suspension, upon receipt of the notice a provider is entitled to "a contested case, as defined in section 14.02, subdivision 3." *Id.*, subd. 2(f).

Because DHS can only temporarily suspend NUWAY's Medicaid payments and must follow certain requirements to do so—including providing a contested case proceeding—NUWAY has a constitutionally protected interest in the payments. *See, e.g.*, *Abba Pharmacy Inc. v. Perales*, No. 87-CV-266 (MGC), 1987 WL 13277, at *4 (S.D.N.Y. June 29, 1987) ("Plaintiffs also have a property interest in the payments which the State cannot permanently deprive them of absent a hearing."); *Maynard v. Bonta*, 02-CV-6539, 2003 U.S. Dist. LEXIS 16201, at *57 (C.D. Cal. Aug. 29, 2003) (reasoning that a provider has a property interest in funds withheld contrary to the governing statutes and regulations);

*Alexandre v. Ill. Dep't of Healthcare & Fam. Servs.*, No. 20-CV-6745, 2021 WL 4206792, at *7 (N.D. Ill. Sept. 15, 2021) ("Federal courts have stated that the government may not deprive a provider of [Medicaid] funds indefinitely without a hearing" and "where the governing statutes and regulations provide that withholding may be 'temporary' only, a provider can 'regain' his property interest in the withheld funds if the investigation continues indefinitely" (internal quotation marks and citations omitted)).

As discussed further below, DHS has acted contrary to these statutory requirements in multiple ways—including by failing to provide NUWAY with a hearing and by imposing an indefinite suspension. Accordingly, NUWAY has a protected interest in the Medicaid claims it submits to DHS.

**B.      DHS Failed To Provide Constitutionally Sufficient Procedures.**

DHS has provided no process beyond its insufficient notice that it will withhold payments indefinitely and providing NUWAY the opportunity to respond to generic allegations of fraud in writing. Absent immediate injunctive relief, NUWAY will be forced to terminate its intensive outpatient treatment program without DHS providing the procedure required by federal and state statutes and the Fourteenth Amendment.

**1.      DHS failed to adhere to the statutory procedures for suspending NUWAY's payments.**

Federal and state statute provide NUWAY multiple layers of process. DHS has failed to comply with the statutes.

### a.     DHS failed to provide NUWAY a hearing.

As discussed above, state and federal law require DHS to provide NUWAY with a hearing.  DHS has failed to do so.

DHS's suspension notices cite one of the exceptions to the requirement in Minn. Stat. § 256B.064 that DHS provide notice and an opportunity for a hearing before withholding Medicaid payments.  (Glaser Decl., Ex. A at 2.)  The statute DHS relies upon states: "*Except as provided in paragraphs (b)* and (d), neither a monetary recovery nor a sanction will be imposed by the commissioner without prior notice and an opportunity for a hearing, according to chapter 14, on the commissioner's proposed action . . . ." Minn. Stat. § 256B.064, subd. 2(a) (emphasis added).  DHS relies on paragraph (b).  But that paragraph does not eliminate NUWAY's right to a hearing.  It impacts the *timing* of that hearing by providing that DHS can withhold payments "without providing advance notice." *Id.* subd. 2(b).  A later provision of the statute confirms that NUWAY maintains the right to a hearing.  Subdivision 2(f) provides: "Upon receipt of a notice under paragraph (a) that a monetary recovery or sanction is to be imposed, an individual or entity may request a contested case, as defined in section 14.02, subdivision 3, by filing with the commissioner a written request of appeal." *Id.*, subd. 2(f).

Where, as here, state law provides for administrative review of a payment suspension, federal law requires DHS to set forth "the applicable State administrative appeals process and corresponding citations to state law" in its notice of temporary suspension and to provide the administrative appeal.  42 C.F.R. § 455.23(a)(3), (b)(2)(vi). DHS failed to provide information about the contested case process in the suspension

notices at issue in this case or provide NUWAY with a contested case hearing. (Glaser Decl., Ex. A.) Indeed, contrary to federal and state law, DHS has a policy of refusing to provide an administrative appeal when it withholds Medicaid payments.[5] DHS's policy is wrong. The plain language of the statute—and common sense—lead to the same conclusion. The Legislature provided for a hearing when DHS imposes a sanction. That includes the sanction of a payment suspension. NUWAY is likely to prevail on its Due Process claim because DHS failed to provide notice of the administrative appeals process and a contested case proceeded as required by the law.

      **b.**     **DHS failed to consider whether good cause existed not to suspend payments.**

Both federal and Minnesota law require DHS to analyze whether good cause exists not to suspend payments. 42 CFR § 455.23(e); Minn. Stat. § 256B.064, subd. 2(b); *see also Burgess*, 903 S.E.2d at 619 (agreeing that "performance of the evaluation of whether good cause exists is mandatory"). Good cause exists if, among other things:

> (4) beneficiary access to items or services would be jeopardized by a payment suspension because of either of the following:
>
> > (i) An individual or entity is the sole community physician or the sole source of essential specialized services in a community.

---

[5]     *See, e.g.*, *In the Matter of the SIRS Appeal*, OAH 71-1800-39121 (Minn. Dept. Human Servs. July 24, 2023) (Order Denying Appellants' Motion to Reverse Payment Withhold), available at https://mn.gov/oah/assets/1800-39121-1800-39122-kerry-timothy-adelmann-dhs-sirs-order-on-motion-to-reverse-payment-withhold_tcm19-586577.pdf; *see also* Glaser Decl. ¶¶ 10–11.

(ii) The individual or entity serves a large number of beneficiaries within a HRSA-designated medically underserved area.

. . .

(6) The State determines that payment suspension is not in the best interests of the Medicaid program.

42 CFR § 455.23(e).

Upon information and belief, DHS has failed to perform this mandatory analysis (although DHS claims it has done so). (Glaser Decl. ¶ 5.) If DHS had actually performed the analysis, it would have concluded that good cause exists not to suspend NUWAY's payments because doing so will jeopardize beneficiary access to substance abuse disorder treatment and housing and is not in the best interests of the Medicaid program.

NUWAY is one of Minnesota's largest providers of co-occurring substance use disorder and mental health treatment. (Roberts Decl. ¶ 3.) In 2024, NUWAY provided intensive outpatient treatment to over 4,800 clients and outpatient treatment to more than 540 clients. (*Id.* ¶ 12.) Of the intensive outpatient clients, over 80% consistently participated in the RISE program. (*Id.*) Currently, NUWAY serves over 800 clients in intensive outpatient treatment and more than 80 patients in outpatient treatment. (*Id.*) Of NUWAY's current intensive outpatient clients, 84% currently participate in the RISE program—meaning NUWAY subsidizes their housing in a recovery residence. (*Id.*) NUWAY's intensive outpatient program is offered at seven locations across six counties in Minnesota, which includes recovery residences for patients in rural and unserved areas.

(*Id.*)  In the Twin Cities, NUWAY's intensive outpatient counseling locations serve a large number of beneficiaries within "HRSA-designated medically underserved" areas.[6]

DHS's payment suspension will require NUWAY to close its intensive outpatient treatment program and attempt to transfer its clients to other intensive outpatient treatment providers and other housing providers.  However, there is a shortage of intensive outpatient treatment and outpatient housing in Minnesota.  (Roberts Decl. ¶ 15.)  NUWAY's intensive outpatient clients do not qualify for two of the three alternatives to NUWAY's outpatient facilities—Housing Stabilization Services and Crising Housing.  (*Id.*) Without NUWAY's services, Minnesota's third alternative, Housing Support, which is the option DHS has identified to fill the service gap left by NUWAY's closure, is also insufficient. (*Id.* ¶¶ 16, 20.)   Housing Support simply does not have the resources to house the hundreds of intensive outpatient clients who would need housing without NUWAY.  (*Id.* ¶ 16.)

[6]     The Health Resources and Services Administration ("HRSA") has identified areas across the country which it considers underserved in various respects, including those which are "medically underserved." *What is Shortage Designation*, HRSA HEALTH FORCE, https://bhw.hrsa.gov/workforce-shortage-areas/shortage-designation (last vised Feb. 5, 2025). Medically underserved areas are those that "have a shortage of primary care health services within geographic areas such as a whole county, a group of neighboring counties, a group of urban census tracts, or a group of county or civil divisions." *Id.*

Some of NUWAY's intensive outpatient counseling centers are physically located within or near HRSA-designated medically underserved areas.  Its Northeast Minneapolis location is within census tract number 1025, part of the "Minneapolis Northeast Service Area," which  has been designated as medically underserved.  *See MUA Find*, DATA.HRSA.GOV, https://data.hrsa.gov/tools/shortage-area/mua-find (last visited Feb. 5, 2025).  Its Blaisdell Avenue intensive outpatient counseling center is in the tract immediately north of census tract 1070, part of the medically underserved "Southside Minneapolis Service Area."  *Id.*

Furthermore, Housing Support is not a well-suited solution for individuals engaged in intensive outpatient treatment because a majority of the providers are not abstinence based (meaning participants in the Housing Support program are not required to abstain from drugs and alcohol). (*Id.*) As a result, such housing lacks the supportive peer environment demonstrated to support a recovery process and may expose vulnerable individuals to direct relapse triggers. (*Id.*)

The clearest indication that beneficiary access to services would be jeopardized and that the payment withholds would not benefit Medicaid came from DHS themselves. On February 4, 2025, DHS and NUWAY met to discuss the transition of NUWAY patients to other treatment and housing providers if the payment withholds went into effect. DHS inquired whether NUWAY had capacity in any of its inpatient treatment programs such that NUWAY'S intensive outpatient clients could be transferred to that higher level of care after payment withholds were in place and NUWAY's intensive outpatient treatment ceased. (Id. ¶ 18). Remarkably, DHS was inquiring whether clients in the NUWAY program allegedly tainted by fraud could be transferred to a higher level of care—in other words, a level of care that is not medically necessary for the clients and more expensive for DHS—with the same entity that DHS believes has committed fraud. Setting aside the greater cost of such a plan to Medicaid, and DHS's arguably fraudulent plan to send clients who have qualified for outpatient treatment to inpatient treatment, the suggestion makes it abundantly clear that the treatment and recovery-focused housing market in Minnesota will not be able to support NUWAY's clients if NUWAY is forced to cease its intensive inpatient treatment program.

Suspending NUWAY's payments—and forcing its immediate closure—is not in the best interests of the Medicaid program. Not only will suspension interrupt the continuity of treatment for NUWAY's clients and cause them to lose their housing—significant, simultaneous harms that could have life-threatening consequences for impacted clients—but it will cost the Medicaid program more money. The state has programs that pay for housing in certain circumstances. (Roberts Decl. ¶ 15.) Those strained programs have struggled to make a difference in the lives of the Minnesotans they are meant to serve.[7] Rather than having its clients seek state funds, NUWAY has been willing to subsidize RISE program participants' housing using funds it was already receiving as part of its mission. (Roberts Decl. ¶ 10.) This approach has lowered the state's overall outlay because it did not need to pay for NUWAY's clients' housing. (*Id.*) Suspending NUWAY's payments will destroy its ability to help carry the load of housing Minnesotan's who qualify for government aid and shift that burden back to the state.

The decision in *Trinity Behavioral Health Care Systems v. Arkansas Department of Human Services* is instructive. In that case, providers of inpatient psychiatric services and outpatient mental health counseling moved for a TRO to prevent the suspension of their Medicaid payments. No. 14-cv-00651 KGB, 2014 WL 5817095, at *1 (E.D. Ark. Nov. 7,

---

[7] *See, e.g.*, Susan Du and Jessie Van Berkel, *Housing Program Dogged with Complaints of Wait Times, Potential Fraud*, The Minnesota Star Tribune (Feb. 2, 2025), available at https://www.startribune.com/housing-stabilization-services-homeless-problems-fraud/601215772 ("Minnesota's rollout of one of the nation's first Medicaid-funded programs to help people find and keep housing has been deeply flawed," and "issues with the program have made it harder for [providers] to house people . . . .").

2014).  The district court granted the providers' request based, in part, on the harm suspension would cause to plaintiffs and their patients because "Medicaid beneficiaries make up over 99% of [the providers'] patients" and they would "immediately be forced out of business" by the suspension.  *Id.* at *3.  The court noted that if plaintiffs were shuttered, the other providers in the state would likely be "unable to absorb their 2,600 patients."  *Id*. at *4.  The court reasoned that the suspension would result in "potentially devastating consequences to residential patients who may have nowhere else to go for psychiatric care" and "economic hardships for those employed by [the providers] in these underserved communities of the state."  *Id.* at * 5.  Because "the quality of [the providers'] care does not appear to be questioned by ADHS or other officials at this time," the Court granted the TRO.  *Id.*

So too here.  Shuttering NUWAY's intensive outpatient clinics would harm NUWAY's beneficiaries and service areas irreparably. The alternative treatment providers and clinically appropriate sober housing available in NUWAY's absence would simply be "unable to absorb" the clients NUWAY currently serves.  *Id*. at *4. The effect on such a large number and large proportion of beneficiaries, including those within HRSA-designate medically underserved areas, constitutes good cause *not* to suspend payments under 42 C.F.R. § 455.23(e)(4) and (6).

### c.   DHS failed to consider the required factors for sanctions.

In addition to the good-cause analysis just discussed, DHS failed to perform the sanctions analysis required under Minnesota law.  Minnesota statute requires DHS to

consider multiple factors before imposing a payment suspension, including the effect of

NUWAY's conduct on the health and safety the people it serves:

> The commissioner may impose the following sanctions for the conduct described in subdivision 1a: suspension or withholding of payments to an individual or entity . . . . When imposing sanctions under this section, the commissioner shall consider the nature, chronicity, or severity of the conduct and the effect of the conduct on the health and safety of persons served by the individual or entity.

Minn. Stat. § 256B.064, subdivision 1b.

NUWAY has tried to discuss the grounds for the payment withhold with DHS, the

nature and severity of the alleged conduct, and the benefit NUWAY's RISE Program has

on the health and safety of the individuals it serves. (Glaser Decl. ¶¶ 5–9.) DHS has

rejected those efforts. (*Id.*) DHS has never provided any analysis that comports with

subdivision 1b to NUWAY. (*Id.*) And NUWAY's recent conversations with DHS

demonstrate the opposite—DHS has not meaningfully considered the nature or severity of

NUWAY's alleged conduct or the positive impact it has had on thousands of clients. (*Id.*;

Roberts Decl. ¶ 12.)

### d. DHS failed to impose a "temporary" suspension.

DHS is only authorized to withhold NUWAY's Medicaid payments on a

"temporary" basis. 42 CFR § 455.23(c)(1). The notice of suspension must state "that the

suspension is for a temporary period," and "cite the circumstances under which the

suspension will be terminated." *Id.* § 455.23(b)(2)(iii); *see also* Minn. Stat. § 256B.064,

subd. 2(c)(3). The statutes do not provide a maximum number of days or months a

temporary suspension can be in place. DHS loses authority to maintain the suspension

"after either of the following: (i) The agency or the prosecuting authorities determine that there is insufficient evidence of fraud by the provider. (ii) Legal proceedings related to the provider's alleged fraud are completed."  42 CFR § 455.23(c)(1); *see also* Minn. Stat. § 256B.064, subd. 2(d).

Here, DHS's notice of suspension claims that it is "temporary."  That is a fiction. DHS has known about the DOJ's False Claims Act investigation for *at least* one year. (Glaser Decl. ¶ 3.)  It is not temporarily suspending NUWAY's payments all this time later so that it can investigate.  DHS and the DOJ have already made up their minds.  They believe NUWAY violated the FCA.  (*Id.* ¶¶ 2, 9.)  Rather than bring an FCA lawsuit— where they will have to prove up such allegations with a trial on the merits—the government is attempting to put NUWAY out of business without any meaningful notice or opportunity to be heard.

This is DHS's practice and policy.  DHS routinely suspends providers' Medicaid payments without providing any substantive information about the purported "credible allegation of fraud" on which the suspension is based and without giving the provider any meaningful opportunity to be heard.  (Glaser Decl. ¶¶ 10–11.)  These suspensions often last indefinitely, with one "temporary" suspension currently in place at nearly seven years (and counting).  (*Id.*)  DHS routinely takes the position, as it does here, that its "temporary" suspensions will continue for the maximum time permitted by federal law: until DHS changes its mind about the credible allegation of fraud or legal proceedings related to the provider's alleged fraud are completed.  (*Id.* at Ex. A.)  Unsurprisingly, this results in indefinite suspensions because DHS is unlikely to change its mind (nor are there any

incentives for DHS to reconsider when it believes providers have no appeal rights) nor do any "legal proceedings" related to the fraud typically take place when the providers are summarily shuttered. Even if legal proceedings were commenced against the providers (who now have no ability to pay the government any civil damages), FCA cases last years, and suspension of payment for the duration of an FCA lawsuit would still cross the line from temporary to indefinite. *See, e.g.*, *Alexandre v. Illinois Dep't of Healthcare & Fam. Servs.*, No. 20 C 6745, 2021 WL 4206792, at *9 (N.D. Ill. Sept. 15, 2021) (concluding that a physician had a property interest in Medicaid payments withheld beyond the "temporary" duration permitted by the law and " in the year and a half that [the physician's] Medicaid payments have been suspended, that suspension crossed the line from 'temporary' to 'indefinite'").

DHS's payment suspensions violate NUWAY's due process rights because they are indefinite suspensions—beyond the temporary suspensions authorized by the law—without meaningful notice or an opportunity to be heard.

> **e. The (suspected) allegations against NUWAY are not credible allegations of fraud.**

The last procedural safeguard provided in the federal and state statues is that DHS can suspend payments only if it determines "there is a credible allegation of fraud for which an investigation is pending under the Medicaid program against an individual or entity." 42 CFR § 455.23(a)(1); Minn. Stat. § 256B.064, subd. 2(b)(2).

"Fraud means an intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to himself or

some other person. It includes any act that constitutes fraud under applicable Federal or State law." 42 CFR § 455.2. A credible allegation of fraud must be "verified by the State." *Id.* "Allegations are considered to be credible when they have indicia of reliability and the State Medicaid agency has reviewed all allegations, facts, and evidence carefully and acts judiciously on a case-by-case basis." *Id.*; Minn. Stat. § 256B.064, subd. 2(b)(2).

As noted above, DHS's suspension notices provided bare bones information about the "credible allegation of fraud" against NUWAY. Such generic allegations make it difficult for NUWAY understand what alleged conduct is at issue or to provide a meaningful response.

It is NUWAY's belief that the "credible allegation of fraud" on which DHS relies is the False Claims Act ("FCA") investigation being conducted by the United States Department of Justice—although DHS refused to confirm or deny this when NUWAY inquired. (Glaser Decl. ¶ 5.) While information received from such a source could qualify as a credible allegation of fraud under the statute, here, NUWAY has multiple, legitimate defenses to the potential FCA claims NUWAY believes (but does not know) have given rise to the payment suspension. If the Court does not grant NUWAY its requested injunction, NUWAY will never get its day in Court to pursue these defenses and exonerate itself.

### (i) NUWAY's RISE program is not fraudulent.

Nearly three years ago, the DOJ started an inquiry regarding whether NUWAY's RISE program violated the FCA. (Glaser Decl. ¶ 2.) The FCA imposes civil liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for

payment or approval" to the United States. 31 U.S.C. § 3729(a)(1)(A). One way to prove that a claim is "false or fraudulent" is through a second law, the Anti-Kickback Statute ("AKS"). The AKS imposes criminal liability on anyone who pays illegal kickbacks for any "item[s] or service[s]" paid "in whole or in part" by Medicare or Medicaid. 42 U.S.C. § 1320a-7b(b)(2), (f), (g). Under a 2010 amendment, submitting a claim to the government that "includes items or services resulting from a[n] [anti-kickback] violation" makes a claim "false or fraudulent" under the False Claims Act. *Id.* § 1320a-7b(g).

To prevail on an FCA claim premised on a violation of the AKS, the government must prove both an FCA violation and an AKS violation. The FCA is violated when: (1) the defendant made a claim for payment to the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent when it was made. *Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063, 1070 (8th Cir. 2016). The AKS, on the other hand, is violated when a person "knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person" to "refer an individual" for an item or service paid for by Medicare or Medicaid or to themselves purchase such an item or service. 42 U.S.C. § 1320a-7b(b)(2). In addition, the government must prove "a but-for causal relationship" between the AKS violation and the defendant's claim—in other words, that the defendant "would not have included particular 'items or services' absent the illegal kickbacks." *United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828, 834–35 (8th Cir. 2022).

NUWAY believes (but does not know) that the "credible allegation of fraud" giving rise to DHS's payment suspension is that the claims NUWAY submitted to Medicaid for substance abuse services provided to patients in the RISE program were false because subsidizing sober housing is an AKS violation that taints the claims. NUWAY has strong defenses to that claim, which negate the credibility of any allegation that NUWAY committed fraud.

### (1) NUWAY has been transparently providing the RISE program for many years.

An example of a classic healthcare kickback claim looks something like this: A patient goes to see their primary care physician. The physician refers the patient to a particular cardiac physician for tests. Unbeknownst to the patient, their primary care physician has an arrangement in which the cardiac physician will give him $100 for every patient the primary care physician refers. The patient does not know that her physician may be making a recommendation, not based on what is necessary or appropriate, but based on the physician's own self-interest. The facts of NUWAY's RISE program could not be more different than this example.

NUWAY was extremely transparent about the RISE program and what it entailed. NUWAY told clients and the substance abuse disorder treatment industry about the RISE program. (Roberts Decl. ¶ 12.) NUWAY told the organizations responsible for managing its Medicaid reimbursements about the RISE program. (*Id.* ¶ 13.) Any NUWAY told DHS about the RISE program. (Glaser Decl. ¶¶ 12–14.)

For instance, in 2019, NUWAY applied for the DHS Commissioner's Circle of Excellence Award. (*Id.* ¶ 12.) Its application fully detailed the RISE program: it explained that "all NUWAY clients are eligible to receive recovery residence subsidization contingent upon weekly treatment compliance reflecting outcome-based goals (sobriety, attendance, behavior, etc.)." (*Id.*) The information submitted to the DHS Commissioner also noted that "NUWAY offers this subsidization from their own resources and there is no additional cost to the client or third-party payor." (*Id.*) Although NUWAY did not receive the DHS Award, DHS did not raise any concerns about the RISE program. (*Id.* ¶ 16.)

On April 5, 2019, four DHS professionals visited and met with four NUWAY employees to learn about the RISE program. (*Id.* ¶ 13.) The objectives of the meeting were to "acquaint DHS Staff with RISE Model." (*Id.*) It appears DHS officials toured two recovery residence partner homes, which were listed on the agenda with the monthly fee and NUWAY's coverage for the fee. (*Id.*)

Also in April 2019, NUWAY's Public Policy Director emailed a DHS Legislative and Policy Liaison to inquire whether proposed state legislation would render RISE illegal. (*Id.* ¶ 14.) Following that exchange, NUWAY's Public Policy Director called an official with the state OIG to explore whether the proposal would jeopardize the legality of RISE. (*Id.*)

Most Medicaid enrollees are covered by managed care organizations as part of the prepaid medical assistance program ("PMAPs"). PMAPs coordinate and manage Medicaid services for beneficiaries. The PMAPs in Minnesota are fully aware of the RISE

program. In fact, they incorporated the details of the RISE program into their contracts with NUWAY. NUWAY's contract with Hennepin Health states: "Provider shall provide monthly recovery residence support of $550[8] to each Eligible Member for the duration of the Member's receipt of covered outpatient treatment from the services Provider." (Glaser Decl. Ex. I.) NUWAY's agreement with HealthPartners has similar language. (*Id.* at Ex. J.)

Indeed, in 2022, UCare presented NUWAY with an *award* for the RISE program. (Roberts Decl. ¶ 13.) UCare gave NUWAY its Innovation Award and recognized that the RISE program for "implementing innovative strategies to improve the mental health and addiction recovery of UCare members" and "addressing housing insecurity as part of addiction care to help individuals who struggle most gain access to sustainable recovery from addiction."[9]

NUWAY's conduct is not the type of "intentional deception or misrepresentation" that constitutes a credible allegation of fraud required for DHS to withhold payments. 42 CFR § 455.2. Moreover, NUWAY's open and noisy treatment of its RISE program creates a very difficult barrier for the DOJ to overcome in order to prove that NUWAY was knowingly and willfully trying to cheat the government, as required for an FCA

---

[8]    RISE originally provided a stipend in the amount of $550 per month. The current stipend is $700 per month. (Roberts Decl. ¶ 10.)

[9]    *See NUWAY honored at UCare's "A Salute to Excellence!" celebration*, NUWAY Alliance (October 28, 2022), available at https://www.NUWAY.org/NUWAY-honored-at-ucares-a-salute-to-excellence-celebration.

predicated on an AKS violation. *See, e.g.*, *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992) (reasoning that the fact the defendant was "open with the government" and the "the government knew" about the alleged falsity of the claim shows that the defendant was "not cheating the government"); *U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 951 (10th Cir. 2008) (explaining that "an inference arises that a [defendant] has not 'knowingly' presented a fraudulent or false claim" when "the government knows and approves of the facts underlying an allegedly false claim prior to presentment").

> **(2)     The RISE program did not induce referrals or direct purchases.**

To have violated the AKS, NUWAY must have knowingly and willfully paid remuneration "to any person to induce such person":

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program[.]

42 U.S.C. § 1320a-7b(b)(2). NUWAY also has a strong argument that the RISE program housing subsidy was not paid "to induce" referrals of clients to NUWAY or "induce" Medicaid beneficiaries to sign up for NUWAY's intensive outpatient treatment.

Only two groups received the alleged "remuneration" (the housing subsidy): recovery residences and NUWAY's clients. But NUWAY generally does not receive referrals from recovery residences (in fact, the referrals flow in the opposite direction).

(Roberts Decl. ¶ 11.) So that theory does not work as a matter of fact. On the other hand, any theory that the housing subsidy was paid to induce clients to sign up for NUWAY treatment fails as a matter of law.

For the majority of the RISE program's existence, Minnesota provided counties (and other placing authorities) sole authority to determine whether and from which provider Medicaid beneficiaries received services.[10] *See* Minn. Rule 9530.6620, subp. 1 (2021) ("[T]he placing authority must determine appropriate services for clients . . . ."); Minn. Rule 9530.6620, subp. 9 (2021) ("[T]he placing authority maintains the responsibility and right to choose the specific provider . . . ."). Because the placing authority, not the beneficiary, had control over the patient's course of treatment, and it was not possible for NUWAY to improperly induce services directly from potential clients as a matter of law. The major problems with proving that the RISE program was an inducement also mitigate against a finding that there is any "credible allegation of fraud" here.

---

[10] Minnesota's placement scheme was amended in 2022 to allow for "Direct Access." *Direct Access*, Minnesota Department of Human Services, https://mn.gov/dhs/partners-and-providers/news-initiatives-reports-workgroups/alcohol-drug-other-addictions/sud reform/#:~:text=Direct%20Access%20allows%20an%20individual,removes%20duplicati on%20of%20comprehensive%20assessments (last visited Feb. 7, 2025) (explaining that "Direct Access allows an individual to go directly to a provider they choose to receive a comprehensive assessment and access care immediately" rather than "going through a placing authority").

### (3) The RISE program does not provide "remuneration."

In addition, NUWAY has a strong argument that the housing subsidy does not constitute "remuneration" within the meaning of the AKS. However, the "term 'remuneration' does not include . . . remuneration which promotes access to care and poses a low risk of harm to patients and Federal health care programs." 42 U.S.C. 1320a–7a(i)(6)(F).[11]

Here, it cannot seriously be disputed that the RISE program promotes access to care. UCare gave NUWAY an award for the RISE program for this very reason. (Roberts Decl. ¶ 10.) In addition, the University of Minnesota conducted a study that showed NUWAY's intensive outpatient clients were twenty percent more likely to complete treatment if they participated in RISE, and that, on average, participants in recovery housing spent thirty-seven more days in treatment than those not in housing. (*Id.* ¶ 13.) Inclusion of recovery housing as an integrated component of treatment has been demonstrated to result in better

---

[11] This definition of remuneration is organized in a cousin of the AKS—the civil penalties section of the Social Security Act—which proscribes virtually identical conduct as the AKS but provides for civil, rather than criminal, penalties. *See* 42 U.S.C. § 1320a-7a(a)(5) (imposing civil monetary penalties on a person who "offers to or transfers remuneration to any individual eligible for benefits under . . . a State health care program . . . that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, under . . . a State health care program). Congress intended this definition of remuneration to apply to the AKS. To hold otherwise results in the absurd conclusion that Congress meant to exempt certain behavior from civil penalties but still allow to be jailed for the same conduct. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 429 (1998) (rejecting a reading of a statute that "would produce an absurd and unjust result which Congress could not have intended").

outcomes for clients receiving that support, including increased days of abstinence, reduced mental health disorder symptoms, and increased rates of successful treatment completion. (*Id.* ¶ 23.) The most recent American Society of Addiction Medicine guidance formally published in 2024 includes recovery residence housing as a formal part of the treatment continuum. (*Id.*)

In addition, the RISE program poses a low risk of harm to patients and Federal health care programs, especially where, as here, Minnesota counties were responsible for first determining that NUWAY's intensive outpatient treatment was appropriate for its clients, *see* Minn. Rule 9530.6620, subps. 1, 9, and because the RISE program resulted in NUWAY, rather than Minnesota, paying to house NUWAY's intensive outpatient clients.

### (ii) NUWAY's prior "midpoint" billing practice is not fraudulent.

The other primary topic of focus in the DOJ's FCA investigation focused on whether NUWAY was billing for the proper number of units when submitting claims. (Glaser Decl. ¶ 6.) Again, the investigation has revealed no credible allegation of fraud.

DHS provides reimbursement for "alcohol and/or drug counseling per hour" using the Healthcare Common Procedure Coding System (HCPCS) Procedure Code H2035. (Glaser Decl. Ex. G.) In July 2014, DHS issued a Bulletin explaining how to bill for such counseling services. (*Id.* ¶ 18 & Ex. G.) The memo explains H2035 "is defined by a unit of time," which is attained once the "mid-point" is passed:

> Because this code is defined by a unit of time, both the Administrative Uniformity Committee (AUC) and CPT language support the concept that the unit of time is attained when the mid-point is passed, and that more than half of the

> time must be spent performing the service in order to report that code, excluding any breaks. Accordingly, treatment services must last 31 continuous minutes to qualify as an hour of service.

(*Id.* Ex. G.)  The memo contains examples to illustrate this rule, one of which is: "31 Minutes of Treatment Services Provided = 1 Billable Hour." (*Id.*)  NUWAY was aware of, and relied on, this guidance in structuring its treatment schedule and in billing for services. (*Id.*)

The Minnesota Health Care Program Manual ("Manual") contains billing instructions for treatment programs.  (*Id.* ¶ 20.)  Until a recent change (issued on September 4, 2024), the Manual language was nearly identical to the instruction found in the July 2014 Bulletin.  (*Id.*)  The Manual said that H2035 is for "alcohol and/or drug counseling per hour," the "code is defined by a unit of time," and the unit "is attained when the mid-point is passed, and more than half of the time must be spent performing the service for reporting a specific code, excluding any breaks."  (*Id.*)  In other words, once a counseling session passed the "mid-point" of an hour—i.e., 31 minutes—the provider had provided a unit of service and could receive reimbursement.

Relying on this clear guidance, NUWAY often scheduled its sessions for periods of less than an hour (such as 35-minute sessions), took short breaks, and then began another session of less than an hour.  (*Id.* ¶ 21.)  This practice was more prevalent during and after the COVID-19 pandemic.  (*Id.*)  When a session passed the midpoint, it constituted a "unit of time" for which NUWAY could receive reimbursement.  In reliance on DHS's guidance, NUWAY billed for one unit for these sessions.

In September 2024, DHS drastically changed its guidance.  (*Id.* ¶ 22.)  Under the new language, a session must be *scheduled* for a full hour in order to bill a unit of service.  (*Id.*)  If a full hour is scheduled, but the patient leaves unexpectedly after receiving more than 31 minutes of care, a unit may be billed.  (*Id*.)  NUWAY adapted its group treatment schedule and billing practice to conform to DHS's new position.  (*Id.*)

While DHS's new position may control reimbursement going forward, it does not mean there is a credible allegation of fraud regarding NUWAY's past practice under DHS's old regime.  In fact, it demonstrates the opposite.  NUWAY's billing practice was entirely consistent with the DHS-provided billing instructions at the time.  NUWAY was aware of this guidance and relied on it, negating the required scienter under the FCA that NUWAY knew its claims were false when it made them.  *See United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749, 752 (2023) (holding that the "FCA's scienter element refers to [the defendant's] knowledge and subjective beliefs" and the focus is on "what the defendant thought when submitting the false claim" not "on *post-hoc* interpretations").

DHS changed its instruction because it knew that the old instruction expressly permitted exactly what NUWAY did.  It changed the guidance because it wanted to change practices.  DHS is permitted to do that.  It is not permitted to suspend payment to an organization that acted consistently with its instruction.

In sum, there are no credible allegations of fraud against NUWAY.  The due process provided by the applicable state and federal statues here must allow NUWAY procedures to vindicate its strong arguments that DHS's payment suspension is improper.

## 2. Alternatively, Minnesota's Statute Regarding the Suspension of Medicaid Payments Is Unconstitutional.

If the Court concludes that federal and Minnesota statutes do not provide NUWAY the right to a hearing regarding DHS's payment suspension, then Minnesota's statute is unconstitutional and NUWAY must be provided a hearing based on its right to due process under the Fourteenth Amendment. *See Alexandre*, 2021 WL 4206792, at *10 (finding that defendants violated Fourteenth Amendment's due process protections by withholding reimbursements without a hearing and "without providing any substantive information" about the alleged violations); *Maynard*, 2003 U.S. Dist. LEXIS 16201, at *57 ("[T]he government may not deprive a provider of such funds indefinitely without a hearing."); *Yorktown Med. Lab'y, Inc. v. Perales*, 948 F.2d 84, 89 (2d Cir. 1991) ("DSS, however, may not withhold payment indefinitely without some findings as to acceptable practices."); *Abba Pharmacy Inc.*, 1987 WL 13277, at *4 (holding the state cannot deprive plaintiff payments without a hearing).

## III. THE BALANCE OF HARMS AND THE PUBLIC'S INTEREST FAVOR INJUNCTIVE RELIEF.

The last two *Dataphase* factors—balancing the harms of granting and denying an injunction and the public's interest—also favor an injunction here.

As discussed above, NUWAY and its clients will be irreparably harmed if DHS's payment suspension is not enjoined. NUWAY will be forced to close its intensive outpatient treatment. Its patients will likely be unable to find alternative suitable treatment or housing—which may have disastrous consequences for those impacted. Alternatively, if DHS is able to find substitute treatment providers or housing for these individuals, there

will be no benefit to the public fisc because Medicaid will continue to pay for the medically necessary substance abuse disorder treatment for which it would have otherwise reimbursed NUWAY. This is not a situation where DHS is claiming that it needs to put a stop to paying for medically unnecessary services or services that are not actually being provided to protect public funds. To the contrary, NUWAY is providing high-quality, effective substance abuse recovery services to hundreds of Minnesotans. There is no meaningful harm to DHS if it pays NUWAY for those services or another provider.[12] In addition, if NUWAY can no longer subsidize its clients' housing, DHS may be called on to pay for that housing, resulting in more public dollars being spent, not less.

The balance of harms is heavily skewed in favor of a TRO or an injunction. Many individuals, not just NUWAY, will be seriously negatively impacted by a payment suspension. Where, as here, there have been no concerns expressed about the quality of care NUWAY is providing or the medical necessity of the services, there is no real benefit to DHS or the public in suspending NUWAY's payments, thereby shuttering a major provider in Minnesota's substance use disorder and mental health treatment eco-system.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully requests that the Court grant their motion for a temporary restraining order and/or preliminary injunction and enjoin DHS

---

[12] Especially where, as here, the substitute providers available largely operate in the exact same manner as NUWAY, assisting their clients in paying for sober housing. (*See* Roberts Decl. ¶¶ 19–20.)

from withholding all Minnesota Health Care Programs payments for substance use disorder

treatment services to NUWAY.


Dated: February 8, 2025

/s/ Manda M. Sertich
Manda M. Sertich (#0504328)
Rachel L. Dougherty (#0399947)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 492-7000
msertich@fredlaw.com
rdougherty@fredlaw.com

***Attorneys for Plaintiffs***